**OKLAHOMA LAND CO. et al. v. THOMAS et al.**

No. 5155—Opinion Filed Feb. 11, 1919.

Rehearing Denied April 15, 1919.

(179 Pac. 937.)

(Syllabus.)

1. **Indians—Property—Descent—Creek Indians.**

Section 1, art. 2, of chapter 12 of the

Laws of Muskogee (Creek) Nation, and section 258 of chapter 14 of the Laws of said nation as compiled and codified by A. P. McKellop under Act of October 15, 1892, confers upon an illegitimate child who has been recognized by the father as his own the right to share in the estate of the putative father who had recognized such child as his own, but does not give to the brothers and sisters of the half blood of such illegitimate child the right to share in its estate with the sister of the whole blood when the father died prior to the death of such child.

### 2. Same—Recognition of Illegitimate Child —Descent.

The effect of the recognition by the father of an illegitimate child did not have the general effect of rendering such offspring legitimate, but only had the effect of determining the line of descent which should prevail as to the property of such father or child at the time of their death respectively. The act of recognition by the putative father had no effect upon the relations between the child and the mother. As to her, the child was still illegitimate.

### 3. Same—Descent of Property—Allotment— Statute.

The rules by which the descent of property is cast are subject to the will of the Legislature, and when chapter 49 of Mansfield's Digest was extended over the Creek Nation by Act Cong. June 30, 1902, c. 1323, 32 Stat. 500, prior to the death of an illegitimate child its allotment would descend as therein provided.

Error from District Court, Wagoner County; R. C. Allen, Judge.

Action by John R. Thomas and another against the Oklahoma Land Company and another. Judgment for plaintiffs, and defendants bring error. Affirmed.

H. C. Thurman and Gibson & Hull, for plaintiffs in error.

Robert F. Blair and Grant Foreman, for defendants in error.

HARDY, C. J. On the former appeal in this case, the judgment of the trial court was reversed because that court excluded evidence offered of an alleged custom among the Creeks which permitted plural marriages prior to October 22, 1881, being the date the Creek law regulating marriages was passed by the Creek Council, and because the trial court directed a verdict for defendants. 34 Okla. 681, 127 Pac. 8. Upon a retrial, evidence tending to prove the existence of this custom was admitted, and the issue arising thereon was submitted to the jury, who returned a verdict for plaintiffs, and the defendants prosecute error.

It is assigned that the court erred in overruling defendants' demurrer to plaintiffs' evidence and in denying defendants' request for a peremptory instruction at the close of all the evidence. In support of this assignment, it is urged that the evidence offered by plaintiffs was insufficient to overcome the presumption in favor of the legitimacy of the persons under whom defendants claimed.

The land in controversy was the allotment of Lucretia Scott, who died in August, 1906, leaving surviving her neither father, mother, husband, or descendants, but leaving Ellen Johnson, a sister of the full-blood, and brothers and sisters of the half-blood. The plaintiffs claim through the half brothers and sisters. It was the contention of plaintiffs that Lucretia Scott and her sister Ellen Johnson were illegitimate children of one Dixon Scott and Melissa Gregory. Defendants contend that, although Dixon Scott was lawfully married to a freed woman named Nellie Smith by a minister of the gospel on December 24, 1877, the relations which existed between him and Melissa Gregory were permitted and recognized by the customs of the Creeks and constituted them husband and wife, and that the issue begotten of this relation was legitimate. The act of the Creek Council passed October 22, 1881, expressly prohibited plural marriages after that date, and in order for the contention of defendants to be sustained it must appear that such custom, if it existed, existed prior to the date of said act, and that the relations between Dixon Scott and Melissa Gregory commenced prior to that date. If there was any evidence which reasonably tended to show that the relations between Dixon Scott and Melissa were not commenced until after the passage of the act of the Creek Council prohibiting plural marriages, then the demurrer was properly overruled and the request for peremptory instruction properly denied.

There is evidence to show that, when Dixon Scott and Nellie Smith were married, Melissa Gregory was a little girl 7 or 8 years old, living with her father, Bob Bruner, in the vicinity in which Dixon and Nellie lived. Her father was killed in 1886, while Melissa was in the Choctaw Nation away from her home. After her father's death, she returned home and received her share of his estate and thereafter lived with her brother, Jack Bruner, and her grandmother, Granny Hanna. Some time after this, the relations between her and Dixon Scott were commenced, and a child was

born to her January 10, 1888. She was then about 16 or 17 years of age. This child was named Ellen. Within about two years, when she was living at the home of her grandmother, another child was born who was named Lucretia, to whom was allotted the land in controversy. During all the time from their marriage in 1877, until his death in 1891, Dixon Scott and his wife Nellie maintained a home and reared a family of seven children, one of them, Letha, being born about February 24, 1888, 44 days after the birth of Ellen by Melissa. Dixon and Nellie belonged to the Blue Creek Baptist Church, and after the birth of Ellen a formal charge of adultery was made against Dixon Scott upon which he was tried and expelled from the church. In 1891, Dixon Scott was killed by Sunny Luckey, who had married Melissa and who resented the attentions which Dixon still sought to pay her. This evidence not only reasonably tends to prove plaintiffs' allegation that Ellen and Lucretia were the illegitimate children of Dixon Scott and Melissa Gregory, but we think that the great weight of the evidence establishes that fact.

Defendants offered to prove by certain witnesses the existence of a custom among the Creeks, which existed as late as 1892, whereby when a Creek citizen who had contracted a lawful marriage of which union certain children were born, and who was the father of children by a woman other than his lawful wife, recognized such children by the woman other than his wife as his own, such children would inherit with the lawful children the estate of the father; and also offered to prove that, when the father died and thereafter an illegitimate child died, the brothers and sisters of the lawful marriage would share in the distribution of the estate of the illegitimate child. This evidence was rejected, and error is urged upon this action of the court. Section 1, art. 2, of chapter 12 of the Laws of Muskogee (Creek) Nation, and section 258 of chapter 14 of the Laws of said nation as compiled and codified by A. K. McKellop under Act of October 15, 1892, were construed upon the former appeal in this case, and it was held that, when the father of an illegitimate child during his lifetime recognized such child as his own this recognition by the father conferred upon the illegitimate child the right to share in the estate of the putative father who had recognized such child as his own, but did not give to the brothers and sisters of the half-blood of such legitimated child the right to share in its estate with the sister of the

whole blood when the father died prior to the death of such child. Upon the former trial, evidence was introduced tending to show that Dixon Scott in his lifetime had recognized Ellen and Lucretia as his daughters, but it was observed that the effect of this recognition did not appear to legitimatize such children generally or to confer upon them all the legal rights of legitimate children; that the obvious purpose of the statute was to enable illegitimate children who had been recognized by their father to share in his estate upon his demise; and that as to collateral kindred the taint of illegitimacy still adhered. This conclusion was arrived at after a consideration of the evidence of recognition and a construction of the act of the Creek Council last referred to, and such construction becomes the law of the case and will be followed and applied in determining this appeal. Some of the later cases announcing this rule are: City of Ardmore v. Colbert, 52 Okla. 235, 152 Pac. 603; Courtney v. Gibson, 52 Okla. 769, 153 Pac. 677; Bash v. Howard, 59 Okla. 116, 157 Pac. 1154; Chickasha Cotton Oil Co. v. Lamb, 58 Okla. 22, 158 Pac. 579.

It is urged, however, that on the former trial evidence was not offered tending to show that in the administration of the estates of deceased persons, in the Creek Nation under the circumstances here involved, the half brothers and sisters were permitted to share in the estate of an illegitimate child. Even if we assume that it was competent to offer this evidence to vary the construction placed upon the act of the Creek Council defining the rights of an illegitimate child who had been recognized by its father, still the exclusion of this evidence was not error. As has already been seen, the act of recognition did not have the general effect of rendering such offspring legitimate, but only had the effect of determining the line of descent which should prevail as to the property of such father or child at the time of their deaths, respectively. The act of recognition by the putative father had no effect upon the relation between the child and the mother. As to her the child was still illegitimate. Our attention has been called to no Creek statute of legitimation whereby the taint of illegitimacy might be removed generally and the status given such offspring as that possessed by a child born in lawful wedlock, nor does the evidence which was excluded tend to establish such a custom. It is true, some of the witnesses testified that there was no such thing as bastard children in the

Creek Nation; but this testimony cannot be considered in the fact of the act of the Creek Council dated October 13, 1881, expressly prohibiting plural marriages. The argument of defendants is that the act of recognition conferred the status of legitimacy upon Ellen and Lucretia, and that this status, having been once acquired, continued and was not affected by the Act of Congress June 30, 1902, 32 Stat. L. 500, extending the Arkansas laws of descent and distribution as contained in chapter 49 of Mansfield's Digest over the Creek Nation. This is erroneous because it assumed a premise not proven. The only effect of the recognition by Dixon Scott of Ellen and Lucretia was to establish a right of inheritance in the property of their father; but if we go further, and say that such act of recognition conferred upon the half brothers and sisters the right to share in the estate of Lucretia, this was not a vested right, for no one has a vested right to inherit the property of a living person. Barnes v. Barnes, 47 Okla. 117, 147 Pac. 504.

The rules by which the descent of property is cast are subject to the will of the Legislature. Holloway v. McCormick et al., 41 Okla. 1, 136 Pac. 1111, 50 L. R. A. (N. S.) 536. And when chapter 49 of Mansfield's Digest was extended over the Creek Nation prior to the death of Lucretia, her allotment would descend as therein provided. Section 2524, Mansfield's Digest, is as follows:

· "Illegitimate children shall be capable of inheriting and transmitting an inheritance, on the part of their mother, in like manner as if they had been legitimate of their mother."

Under this section of the statute, the sister Ellen would inherit the allotment of Lucretia to the exclusion of their half brothers and sisters. Gregley v. Jackson et al.. 38 Ark. 487; Brann v. Bell (C. C.) 192 Fed. 427. This conclusion renders a consideration of the other errors assigned unnecessary.

The judgment is affirmed.

KANE, J. (concurring). This case was submitted on the 21st day of July, 1916, and assigned to me for the purpose of preparing the opinion of the court. Shortly thereafter, I presented my views to the members of the court in conference, but, the same not being approved, the cause was reassigned to another member of the court for the preparation of an opinion in accordance with the views expressed by the majority of the court. Whilst I concur in the opinion thus prepared, I prefer to file the opinion formerly prepared by me, slightly changed to meet the changed conditions, as more nearly expressing my own views upon the precise question presented by counsel for review.

This was an action for the recovery of possession of land, commenced by the defendants in error, plaintiffs below, against the plaintiffs in error, defendants below.

The land involved was the allotment of Lucretia Scott, a Creek freedman. The facts essential to a determination of the question of law involved, over which there is no substantial controversy, may be briefly stated as follows: Dixon Scott, a freedman citizen of the Creek Nation, was formally and legally married to a freed woman, named Nellie, on the 24th day of December, 1877, who bore him six children. Afterward Dixon Scott cohabited with and supported Melissa, another Creek freed woman, who bore him two children, Ellen and Lucretia; the latter being the allottee of the land herein involved. The relation of Dixon Scott with the two women continued concurrently until after the birth of the two children by Melissa. Subsequently, Melissa married Sunny Luckey, who thereafter killed Dixon Scott over trouble growing out of attempts by Scott to continue his attentions to Melissa. There was little or no evidence tending to show that the relation between Dixon Scott and Melissa commenced prior to the passage of the Creek Marriage Law of 1881, which provided that no new marriage shall be contracted whilst either party has a husband or wife surviving. Lucretia, the allottee, died during the summer of 1906, seized of her allotment, leaving neither descendant, husband, father nor brother, but was survived by all of the children of Dixon Scott by both women. The plaintiffs deraign their title through Ellen, the elder daughter of Melissa by Dixon Scott, and the sister of Lucretia, the allottee, and the defendants claim title through the children of Dixon Scott by his lawful wife, Nellie, who they contend are also brothers and sisters of the allottee.

It is conceded that the descent of the land was governed by the laws of descents and distributions of the state of Arkansas, which were extended over and put in force in the Indian Territory by act of Congress, and that under the law the land would go to the "brothers and sisters" of Lucretia, the allottee. The contention of plaintiffs is that Ellen, the elder daughter of Dixon Scott by Melissa, being the only surviving

child of that relation, was the only sister and sole heir at law of Lucretia, the younger daughter of Dixon Scott by Melissa. On the other hand, the defendants contend that by virtue of a certain custom among the Creeks the children of Dixon Scott by Nellie must be deemed to be brothers and sisters of the half blood, of Lucretia, and as such entitled to inherit from her by virtue of another section of said laws, to wit, section 1831, Ind. Ter. Stat. 1899, which provides:

"Relations of the half blood shall inherit equally with those of the whole blood in the same degree; and the descendants of such relatives shall inherit in the same manner as the descendants of the whole blood, unless the inheritance come to the intestate by descent, devise, or gift, of some one of his ancestors, in which case all those who are not of the blood of such ancestor shall be excluded from such inheritance."

Preliminary to the argument of the assignment of error which raises this question, counsel for plaintiffs say in their brief:

"The discussion of this assignment of error necessarily involves the argument of the more specific assignment of error, and, while we feel that it will be unprofitable to here enter upon a general discussion of the question presented to the court on this appeal, it may be well to here suggest that a clear understanding of the position taken by the defendants throughout this action, which has now been pending in the courts of this state for more than seven years, depends upon the acquiring of an unprejudiced view of the conditions which existed in the Creek Nation of Indian Territory prior to the time when the tribal laws and customs, interpreted by the tribal courts which had exclusive jurisdiction over citizens of the Creek Nation, were superseded by the laws of Arkansas as administered by the United States courts in Indian Territory. We recognize the fact that it is difficult to realize just how crude the government of the Creeks was during that period; how ignorant the mass of the people were; how very primitive were their agricultural implements and methods of living; what an absence of restriction upon individual inclinations there was; and how free the people were to establish and terminate the marital relation, and the absolute lack of any permanent obligations, either legal or moral, arising therefrom. This we know because we have three times tried this case in the district court of Wagoner county. and each time have suffered a judgment against us because, as we believe, the court and jury were unable to lay aside those ideals of morality, right living, sacredness of marriage, and the obligations arising out of the marriage relation, which is the heritage left the white man by centuries of civilization, and the inability of the court and jury to place themselves, for the purpose of trying this case, among the characters appearing in the drama presented by the evidence in the case. which characters had only recently emerged from a state of slavery to an untutored people and acquired absolute freedom from all legal, as well as moral restrictions. Our misfortune lay in our inability to show them that the father and mother of the alleged illegitimate child, the allottees of the land in controversy, were not to be judged under the statutes made for the white man and under the 'common law' of the Anglo-Saxon race, but rather under the laws of the Creek Nation and the customs and usages of the Creek people which constituted the common law of the Creeks. We were wholly unable to convince the court and jury that for the purpose of determining whether or not the allottee was a legitimate child they should look upon the relation existing between her father and mother as it was viewed by the freedman of the Creek Nation in the early '80's, rather than as such relation should be viewed if entered into to-day under the changed laws and rules of conduct, under the changed mode of living, and under an entirely different standard of morals."

Furthermore to the same effect, in a reply brief, counsel say:

"* * * In determining who were the brothers and sisters, we must apply to the facts which we established with reference to the family relations the laws and customs of the Creeks, and if as a result of our investigation we determine that the children of Dixon Scott by the woman Nellie, and the children of Dixon Scott by the woman named Melissa, were under all the circumstances considered by the Creeks as brother and sister and children of the same father, then their status is fixed, and all of the half brothers and sisters of the deceased allottee in this case are entitled to inherit their share of her allotment as brothers and sisters."

Whilst all of this is exceedingly interesting, it is not at all convincing to my mind that the conclusion reached by counsel must follow. It may be conceded, for the purpose of this case, that counsel would be able to show that plural marriages were sanctioned by custom among the Creek freedmen, and that the various sets of children born of such marriages were deemed brothers and sisters by the Creeks; and still it would not necessarily follow that they must be deemed to be "brothers and sisters," for the purpose of the descent and distribution of their respective estates pursuant to the laws of the state of Arkansas.

It must be assumed that the Congress knew of the conditions existing in the Indian Territory when it extended over it

the laws of descents and distributions of the state of Arkansas. If, as counsel contend, the custom of plural marriages was sanctioned by custom among the Creek freedmen, and the Congress intended that the various sets of children of such marriages should continue to be deemed brothers and sisters, in the matters of the descent and distribution of their allotted lands, it no doubt would have devised or adopted a system of laws governing descents and distributions which would have more clearly indicated such a purpose. Instead of doing this, the Congress selected the laws of descents and distributions applicable to conditions prevailing in one of the states of the Union deeming them to be adequate for the needs of the Creeks in the matter of the descent of their property. I cannot conceive that the Congress intended that the words of ordinary significance found in these adopted statutes should be given any other meaning in the Indian Territory than the ordinary meaning accorded to them in the communities from which they were taken. It is true that, in order to carry out the purpose of Congress, the courts have often been compelled to adjust, as nearly as may be, the laws of the state of Arkansas to prevailing conditions in the Indian Territory, and many cases may be found where this has been done.

In the case at bar, however, I perceive no great difficulty in applying the sections of the law now under construction, in a practical manner, to the situation presented by counsel in their brief, without injustice or doing violence to the enlightened construction placed upon similar laws of descent and distribution, as such laws are understood and administered by the nonpolygamous Christian inhabitants of the state from whence they came. Whilst the relations shown to have existed between Dixon Scott and Melissa may have cast no social or moral obloquy upon the parties thereto or their children among the Creek freedmen, and while the offspring of Dixon by both women may have been deemed to be brothers and sisters by the Creeks, it is not necessary to accord this status to them in applying the laws of descents and distributions of the state of Arkansas. In my judgment it is more consonant with right and justice and the intention of Congress to hold that the words "brothers and sisters" and "relations of the half blood," as used in sections 1820 and 1831, supra, apply only to such persons as are held to be brothers and sisters and relations of the half blood in the state from whence the

laws were taken. Therefore, without intending or attempting to change or interfere with the social or moral status accorded to Dixon Scott and Melissa, or their offspring, among the Creek freedmen, I find myself unable to accord the status of legitimacy to the fruit of such a relation for the purpose of the descent and distribution of their lands pursuant to the laws of Arkansas. Section 1822, Ind. Ter. Stats. 1899, provides:

"Illegitimate children shall be capable of inheriting and transmitting an inheritance, on the part of their mother, in like manner as if they had been legitimate of their mother."

Under this section, the children of Dixon Scott by Melissa should be deemed legitimate of their mother, and held to be sisters within the meaning of section 1820, supra. Under this rule, Ellen, the elder daughter, being the only surviving child of Dixon and Melissa, inherited the allotment of her sister Lucretia, upon the death of the latter, to the exclusion of the children of Dixon Scott by his lawful wife, Nellie Scott.