**HENSON et al. v. JOHNSON et al.**

No. 16227—Opinion Filed March 23, 1926.

1. **Evidence—Judicial Notice—Written Law of Cherokee Nation on Marriage and Divorce.**

Under the Act of Congress of May 20, 1890, the laws of the Cherokee Nation of Indians were made effective, governing said Indians, pertaining to marriage and divorce, and the courts of the state will take judicial notice of the written law of this tribe relative to such subjects.

2. **Indians—Cherokee Law Against Plural Marriages—Common Law Never Adopted.**

The Cherokee Nation's first written laws were enacted in 1808, a written Constitution was adopted in 1817, and on November 10, 1825, the Cherokee National Council, or Legislature, enacted a written law making it unlawful for any person thereafter to have more than one wife and prohibiting plural marriages. The common law of England was never adopted or recognized by the Cherokee Nation.

3. **Same—Evidence of Custom Permitting Plural Marriages Inadmissible.**

Prior to the dissolution of the tribal government of the Cherokee Indians, the United States expressly recognized the right of the Cherokee Indians to regulate their own domestic affairs, and to regulate marriages be-

tween members of the tribe by the laws of the tribe, and, as in the case of the Cherokee Nation, where there was a written law prohibiting plural marriages, evidence tending to establish a custom of the Cherokee Tribe of Indians permitting plural marriages was inadmissible.

4. **Indians—Recognition of Illegitimate by Father — Sole Effect Upon Descent of Property.**

The effect of the recognition by the father of an illegitimate child did not have the general effect of rendering such offspring legitimate, but only had the effect of determining the line of descent which should prevail as to the property of such father or child at the time of their death, respectively. The act of recognition by the putative father had no effect upon the relations between the child and the mother. As to her, the child was still illegitimate.

5. **Same—Illegitimate Allottee—Inheritance Transmitted on Part of Mother.**

The laws of inheritance of the state of Arkansas, found in Mansfield's Digest, were in full force at the date of the death of the allottee in this case, and she, being an illegitimate child, was only capable of inheriting and transmitting inheritance on the part of the mother, and, under said statute, her full sister, Bettie Tucker, inherited her allotment to the exclusion of her half-brothers and sisters or descendants of deceased half-brothers and sisters.

(Syllabus by Thompson, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Cherokee County; J. T. Parks, Judge.

Action by Jesse Henson et al. against James Johnson et al. Judgment for defendants, and plaintiffs bring error. Affirmed.

C. E. Castle, for plaintiffs in error.

Henry L. Burris and Pearson & Pearson, for defendants in error.

Opinion by THOMPSON, C. This action was commenced in the district court of Cherokee county, Okla., by Jesse Henson, Tony Mouse, Pearl Henson, Charles Henson, Dora Henson, Washington Henson, a minor, by his guardian, T. T. Tucker, Jesse Wofford, Jennie Crawford, Sarah McDaniel, Johnson Tucker, Eliza Chisholm, Alice Neugin, Thompson Tucker, Noah A. Melton, Louella Raper, Rosa Daniel, Mary M. Lamb, and John H. Charboneau, plaintiffs in error, plaintiffs below, against James Johnson, R. A. Ross, F. W. Vivian, M. H. Hickman, Graves Farm Loan Investment Company, a corporation, James S. Turner, S. C. Phillips, C. E. Finley, Alex Boys, the unknown heirs, executors,

administrators, devisees, trustees and assigns of Mary Johnson, deceased, defendants in error, defendants below, to recover their respective interests claimed by right of inheritance as heirs of Mary Johnson, deceased, to 175.52 acres of land, being the allotment of the said Mary Johnson, deceased, as a citizen by blood of the Cherokee Tribe of Indians. The parties will be referred to as plaintiffs and defendants, as they appeared in the lower court.

The plaintiffs claim to be the half-brothers and half-sisters or descendants of deceased half-brothers and half-sisters of Mary Johnson, deceased, claiming to have had a common father but different mothers, and the defendants claim the lands in controversy by right of inheritance through Betty Tucker, nee Henson, who was the only surviving full sister of Mary Johnson, deceased, having the same father and the same mother, and by successive transfers of title from defendant, Betty Tucker, nee Henson, to F. W. Vivian and R. A. Ross, which deed was approved by the county court of Cherokee county, and from James Johnson, the husband of Mary Johnson, deceased, down to Alex Boys, subject to a mortgage of $4,500, with interest thereon at the rate of six per cent. per annum from July 1, 1922, executed to the defendant, Graves Farm Loan Investment Company, a corporation, given as security for the payment of the said sum of $4,500, together with seven interest coupon notes thereto attached in the sum of $270 each, all of which had been paid, except the last interest coupon note, which mortgage and coupons had been assigned from the Graves Farm Loan Investment Company to defendant, James S. Turner.

The record discloses that the allottee, Mary Johnson, died intestate and without issue of her body born living, as shown by the Cherokee tribal enrollment card of Mary Johnson on the 20th day of February, 1905; that she died seized and possessed of the lands in controversy here by patent issued by the Cherokee Nation and approved by the Secretary of the Interior of the United States, and that at the time of her death, she left surviving her James Johnson, her husband, a full-blood Cherokee Indian, and Betty Tucker, nee Henson, a full sister, and the plaintiffs in this case, some of whom are half-brothers and half-sisters and some of whom are descendants of deceased half-brothers and half-sisters; that the full sister and the half-brothers and half-sisters had a common father, Wash Henson; that Wash Henson, long before the Civil War, as testified to by the witnesses, lived with a woman by the name of Jennie, and that,

while living with Jennie, he brought to his home Susie Henson, who was the mother of Charles Henson, Nancy Tucker, nee Henson, and Lydia Wofford, nee Henson, who was dead, and left surviving them their children, who are some of the plaintiffs in this case, and that, while living with these two women, he brought home Rachel Henson, who bore him three children, Katy, Betty Tucker, nee Henson, and Mary Johnson, nee Henson, the daughter Katy having died without issue, and that, at the same time, he brought to his home and lived with Annie Henson; that Annie and Rachel were half-sisters of Susie, having a common father named Mouse; that Wash Henson lived with all three of these sisters at the same time and in the same house, and that all of them bore children to him while so living together; that Wash Henson went to the War Between the States at a date not definitely set out in the record, and upon his return from the war he took a woman by the name of Martha and lived with her, and never returned to the four women heretofore mentioned in this opinion, and never lived with them thereafter; that upon the death of Wash Henson, Susie Henson, as his surviving widow, was granted and received a pension from the government of the United States, but Rachel and Annie never participated in the proceeds therefrom. Thus, it appears that Wash Henson maintained a harem consisting of three or four women as his concubines at one time, whom he afterwards deserted for the woman Martha. Whether the first woman, Jennie, who seems to have been the charter member of his collection of women, or the last woman, Martha, bore any children to Wash Henson, is not disclosed by the record, but that is not pertinent to this opinion under the issues presented.

It is contended by attorney for the plaintiffs that all three of the women, whose descendants are parties to this action, were lawful wives of Wash Henson, under the customs and laws of the Cherokee Nation, which customs and laws, they claim, were recognized by the Act of Congress of May 2, 1890, 26 Stats. 81, c. 182, which authorized the clerk of the United States Court to issue marriage licenses and certificates, to solemnize marriages, and extending the general laws of Arkansas contained in Mansfield's Digest over the Indian Territory relating to divorce and marriage, in which said act it was provided :

"That all marriages heretofore contracted under the laws or tribal customs of any Indian nation now located in the Indian Territory are hereby declared valid, and the issue of such marriages shall be deemed legitimate and entitled to all inheritances of property or other rights, the same as in the case of the issue of other forms of lawful marriage; Provided, further, section 103 of said Laws of Arkansas shall not be construed so as to interfere with the operation of the laws governing marriage enacted by any of the civilized tribes, nor to confer any authority upon any officer of said court to unite a citizen of the United States in marriage with a member of any of the civilized nations until the preliminaries to such marriage shall have first been arranged according to the laws of the nation of which said Indian person is a member."

It is further contended by attorney for plaintiffs in his brief, that the half-brothers and half-sister and the descendants of deceased half-brothers and half-sisters should share by right of inheritance with the full sister the estate of Mary Johnson, deceased; that the half-brothers and half-sisters should share equally with Betty Tucker, and the descendants of the deceased half-brothers and half-sisters should inherit their deceased parents' part by right of representation.

It was contended at the trial, and also by the attorneys for defendants in their brief, that the defendants claimed the lands in controversy as being the allotment of Mary Johnson, an illegitimate child of Wash Henson and the woman, Rachel, and that Betty Tucker, nee Henson, being a full sister, took the entire estate as being the only person who could inherit, and that her husband, James Johnson, under the Arkansas law then in force, could have no interest by curtesy, for the reason that no child was born alive to him and Mary Johnson, and that the defendant Alex Boys was an owner of the land by successive legal assignments, and that the plaintiffs could not inherit the property of their illegitimate sister and aunt.

The trial court rendered its judgment against the plaintiffs and in favor of the defendants, finding that the surviving husband, James Johnson, and Betty Tucker, nee Henson, the full sister, inherited the entire allotment to the exclusion of the plaintiffs.

At the close of the evidence on part of the plaintiffs, the court sustained the defendants' demurrer to the evidence, and instructed a verdict in favor of the defendants. Motion for new trial was heard and overruled, exception reserved by the plaintiffs, and judgment was pronounced by the court in favor of the defendants and against the plaintiffs, and the cause comes regularly upon appeal to this court.

The attorney for plaintiffs sets up eight specifications of error, but submits the case upon two propositions: First, that the court erred in sustaining the demurrer to the evidence and directing a verdict for the defendants; and second, that the court erred in striking out certain testimony.

The Act of Congress heretofore quoted in this opinion recognized marriages contracted under the laws and tribal customs of the Indian Nations in the Indian Territory, but also provided that the Laws of Arkansas should not be construed by the courts to interfere with the operation of the laws governing marriages theretofore enacted by any of the Five Civilized Tribes. The laws of the Indian Tribes, above referred to, are by said act made effective, and the courts of the country will take judicial notice of the laws governing the Indians pertaining to marriage and divorces and with reference to legitimate and illegitimate children, and this court, in the case of Scott v. Jacobs, 31 Okla. 109, 126 Pac. 780, held that the courts of the state would take judicial notice of the statute laws of the Five Civilized Tribes, and the same rule is followed in the case of Guthrie v. Mitchell et vir, 38 Okla. 55, 132 Pac. 138.

It then becomes necessary to review the legislative history of the Cherokee National Council with reference to the subjects involved in this action. The earliest written laws of the Cherokee Nation of Indians that we have in published form date back to 1808. In 1817 a constitutional form of government was adopted by the Cherokee Nation, which Constitution was later enlarged upon in 1825, 1827, and again in 1839, and a form of government under these Constitutions was organized and patterned somewhat after the form of government of the United States of America, with three distinct departments—executive, legislative and judicial. On November 2, 1819, the National Council of the Cherokee Nation, which was the legislative body of the tribe, passed an act regulating marriages between men of the white race and females of the Cherokee Tribe of Indians, which forbade intermarried white men to have more than one wife, and in this act it was recommended that all others should have but one wife thereafter (see page 10, Laws of the Cherokee Nation, 1852), and, on the 11th day of November, 1824, the Cherokee National Council passed a law prohibiting marriages between negroes and Indians or whites, and provided criminal punishment for the violation thereof, and, on November 10, 1825, the National Council passed the following act, which is found at page 57 of the published laws of 1852:

"New Town, Cherokee Nation, November 10, 1825. Resolved by the National Committee and Council, that the section embraced in the law regulating marriages between white men and Cherokee women, and making it unlawful for white men to have more than one wife, and recommending all others, also, to have but one wife, be, and the same is, hereby amended. so that it shall not be lawful hereafter for any person or persons whatsoever, to have more than one wife:"

Again, on October 24, 1855, the Cherokee National Council passed the following act, which is found at page 55 of the published laws of the Cherokee Nation of 1868, containing the laws passed by the National Council from 1839 to 1867, respectively:

"Be it Enacted by the National Council, That all regular ministers of the gospel, of every denomination, having the care of souls, and all judges of this Nation, are hereby authorized and empowered to solemnize the rites of matrimony according to the rites and ceremonies of their respective churches, and all such marriages shall be deemed lawful. No person, being married, shall marry another person without first having obtained a bill of divorce from the proper authority. Nor shall it be lawful for any person to marry and live with, as man and wife, his or her connection nearer than that of a second cousin.

"Be it Further Enacted, That when any person shall die intestate, the estate of such person shall be divided, according to law, between his or her lawful widow or widower, as the case may be, and the legitimate children of the same."

The common law of England was never either adopted or recognized in the Cherokee Nation. We, therefore, find that the Cherokee Tribe of Indians, unlike some of the other tribes, had special written and printed statutes, duly passed by the Cherokee National Council and approved by the Chiefs of the Cherokee Nation, prohibiting plural or polygamous marriages as early as November 10, 1825, and providing for forms of marriage ceremony, and we find in the act of October 24, 1855, a provision that no marriage should be authorized or solemnized between parties, either of whom had been married and had not obtained a bill of divorce from the proper authorities, and it is further provided that, where a person died intestate, the estate of such person should be divided "according to law between his lawful widow or widower, as the case may be, and the legitimate children of the same." Under the evidence of the plaintiffs in this case, we find that Wash Henson lived with the woman Jennie, then took up with Susie, then took up with Rachel, the mother of Mary Johnson, and Betty

Tucker, and then took up with Annie, and that he lived in the same house with these three last named women, who were sisters or half-sisters, all of whom bore children to him, and that he afterwards deserted all of them and took up with a woman named Martha and that he was never married to any of them. Then, there being an express law of the Cherokee Nation prohibiting such illicit relations, as a legal proposition, we are forced and compelled to conclude that no presumption can prevail that he obtained a divorce from any of these women in face of the fact that he lived at the same time and in the same house with all of them, and begot children by them. It would be both libelous and slanderous for this court to hold that there was any custom authorizing such polygamous relations in face of the clear language of the statute law, heretofore set out in this opinion, which was in force and effect in the Cherokee Nation.

This court has said in the case of Pompey v. King, 101 Okla. 253, 225 Pac. 175, and attorneys for both sides of this litigation quote and rely upon this case, as follows:

"Prior to the dissolution of the tribal government of the Seminole Indians, the United States expressly recognized the right of the Seminole Indians to regulate their own domestic affairs, and to regulate marriages between members of the tribe by the laws, customs, and usages of the tribe. In the absence of a written law prohibiting plural marriages, evidence tending to establish a custom of the Seminole Tribe of Indians permitting plural marriages was admissible, and evidence having been introduced tending to prove a custom permitting plural marriages, it was error for the court to instruct the jury that plural marriages were not permitted among the Seminole Indians, the existence or nonexistence of the custom being a question of fact to be determined by the jury."

It will be observed that this court said that "by the laws, customs and usages of the tribe, in the absence of a written law prohibiting plural marriages, evidence tending to establish a custom of the Seminole Tribe of Indians permitting plural marriages was admissible." Then, it follows necessarily that the converse of this rule, stated above, must be true; that, where there was a written law, prohibiting plural marriages, the customs, laws, and usages of the tribe would not be given any force or effect, and that proof thereof would be inadmissible. In the light of the decisions of this court, the citizen mother of this illegitimate child, Mary Johnson, could have been the only person who could have inherited her estate, had she been alive, but, she being dead, then

only the issue of the body of the mother, who, in this case, was Betty Tucker, nee Henson, could inherit, for this court, in the case of Templeman v. Bruner, 42 Okla. 6, 138 Pac. 152, held that where an illegitimate child, although it had been legitimatized by the father, had died intestate, but was survived by the father and mother, who had never intermarried, in such case the mother should inherit the allotment of the deceased child to the exclusion of the father, and that the rights of the mother were superior to the rights of the father, and that the child was still illegitimate in so far as the rights of the mother were involved. And, in the case of Oklahoma Land Co. v. Thomas, 72 Okla. 226, 179 Pac. 937, this court held, under the laws of the Creek Nation, that although the father had recognized his illegitimate child as his son, after the child's death, this did not give to the brothers and sisters of the half-blood of the illegitimate child the right to share in its estate with the sister of the whole blood, where the father died prior to the death of such child, and that such recognition by the father of his illegitimate child only had the effect of determining the line of descent which should prevail as to the property of the father or the child, respectively, and that such act of recognition by the putative father had no effect upon the relations between the child and the mother. As to her, the child was still illegitimate and that, in such case, under Mansfield's Digest of the Statutes of Arkansas, which were in force and effect at the time, the law of inheritance is quoted in said opinion as follows:

"Illegitimate children shall be capable of inheriting and transmitting an inheritance, on the part of their mother, in like manner as if they had been legitimate of their mother."

In the instant case, the father, Wash Henson, and the mother, Rachel Henson, both died long prior to the death of Mary Johnson, and, in fact, long prior to the enrollment of the Cherokee Tribe of Indians and the allotments of lands to them, and we are, therefore, settled in our opinion that Betty Tucker, nee Henson, being the full sister of the illegitimate child, Mary Johnson, inherited the full title to the allotment, involved in this action, to the exclusion of all of her half-brothers and half-sisters and those claiming by, through or under them. To hold otherwise would be to violate the solemn, written statute laws of the Cherokee Tribe of Indians, enacted for the express purpose of prohibiting polygamy and meretricious relations between the sexes, and to enforce the rules of common decency and morality among the members of the tribe,

and to protect the sanctity of the marriage relation, and to provide a rule of inheritance, which is consistent with the laws of the several states and consistent with the laws of the state of Arkansas, which were put in force in the Indian Territory by the acts of Congress.

The contention of attorney for the plaintiffs, that the laws and customs should prevail in the face of express written statutes prohibiting the practice of such customs, cannot be upheld, for, where there is an express written statute, and a usage or a custom is attempted to be enforced, which is in conflict with an existing statutory enactment, said usage or custom is void, as such usage or custom cannot take precedence over solemn acts of the Legislature of a state or government, and the statutory regulation must control, and no evidence is admissible to establish a custom which is in direct conflict with said statutory enactment, as such custom cannot overcome' the positive provisions of the statute.

We are therefore of the opinion that the uncontradicted testimony introduced by the plaintiffs, themselves, showed a relation existing between Wash Henson and the five women named in this opinion, and that said relation, when entered into by them, was expressly prohibited by the statute laws of the Cherokee Tribe of Indians; that such relations existed at the same time and in the same place with full knowledge of all the facts known to Henson and the three women, whose descendants were involved in this action, showing conclusively that neither Wash. Henson nor they ever maintained, or intended to maintain, honest matrimonial relations, and we are, therefore, of the opinion that, under this state of facts proven by the plaintiffs, themselves, the trial court was fully justified in sustaining the demurrer of the defendants, and in instructing a verdict in favor of the defendants and against the plaintiffs, and rendering judgment upon said verdict in favor of the defendants and against the plaintiffs, and that said judgment should be and it is hereby affirmed.

By the Court: It is so ordered.

Note.—See under (1) 23 C. J. p. 136 § 1954; 31 C. J. p. 487 § 25; 14 R. C. L. p. 122; 3 R. C. L. Supp. p. 175. (2) 12 C. J. p. 186 § 14 (Anno); 31 C. J. p. 1279 § 4; 14 R. C. L. p. 122; 3 R. C. L. Supp. p. 175. (3) 17 C. J. p. 471 § 34. (4) 31 C. J. p. 524 § 97; 3 R. C. L. p. 738; 1 R. C. L. Supp. 885. (5) 31 C. J. p. 524 § 96 (Anno).