**ALLEN et al. v. SMITH.**

No. 26238.    Oct. 13, 1936.

D. D. Brunson and D. D. Brunson, Jr., for plaintiffs in error.

Denver N. Davison and B. C. King, for defendant in error.

PHELPS, J.    Jesse Brown, a full-blood Chickasaw Indian, received an allotment of land in Pontotoc county. By his wife, Lucy Brown, he had seven children, born between 1856 and 1882. The plaintiff acquired title to the land involved herein by obtaining deeds thereto from the surviving heirs at law of said Jesse Brown, who had died intestate, and whose estate had not been probated.

The plaintiff discovered upon the records of the county clerk's office a certain contract entered into between Ella Allen and D. D. Brunson, whereunder Ella Allen employed the said Brunson, an attorney, to recover for her a certain claimed interest in the land, as a purported heir of Jesse Brown. The plaintiff then brought this action to quiet title as against the said Ella Allen, hereinafter called defendant. Plaintiff prevailed, and the defendant and her codefendant Brunson appeal.

A number of propositions are urged, but the controlling question, as stated in the brief of plaintiffs in error, is whether the judgment is sustained by the evidence and law. More specifically, the outcome of this action depends upon whether the defendant Ella Allen was the legitimate daughter of Jesse Brown. If she was, Jesse Brown having died intestate, she was entitled to her proper share in the estate. If she was not, then the judgment of the trial court removing the aforesaid contract from record as constituting a cloud upon plaintiff's title, is correct.

The evidence reveals that for many years before Ella Allen was born, and for many years afterward, Jesse Brown and Lucy Brown were lawful husband and wife. It also appears that for about two years, during the married life of Jesse and Lucy

Brown, somewhere in the neighborhood of the year 1868, Jesse Brown cohabited with one Melinda Brown, the mother of the defendant Ella Allen, who was born to them in that year. It is claimed by defendant that Jesse Brown stayed away from his lawful wife, Lucy Brown, during that period, and lived as husband with Melinda Brown, and that therefore the marriage relationship between Jesse Brown and Lucy Brown became dissolved and that a new marriage relationship between Jesse and Melinda Brown came into being, and that subsequently when Jesse Brown went back to Lucy Brown, the effect was to dissolve or divorce the alleged marriage between Jesse and Melinda and renew the lawful relationship between Jesse and Lucy.

. At the outset, we are struck with the important fact that during the period of so-called marital relationship between Jesse and Melinda, resulting in the birth of the daughter Ella Allen, Jesse and Lucy also gave birth to another child, Louisa, whose legitimacy is not questioned. Both Louisa (by Lucy) and the defendant Ella Allen (by Melinda) were born in the same year. Shortly after these births Jesse went back to Lucy and lived with her the remainder of his lifetime, during which time they had three more children. They had had three other children prior to the relationship between Jesse and Melinda, and, as above stated, had another child, Louisa, during that same relationship, born in the same year as that in which the defendant Ella Allen was born to Jesse and Melinda.

The defendants' own main witness, referring to the period during which Jesse Brown was cohabiting with Melinda, described the activities of Jesse in this manner:

"* * * He was slipping up here to this other lady. He was living down there and up here too, going backwards and forwards from one to the other."

This was the period in which a child by the same father was born to each of the women. This same witness testified that after Ella Allen was born to Jesse and Melinda, he "deviled him about it," when talking to Jesse, and that:

"A. They told me, him and her both, they said, 'That is my daughter there, that little child there, that is my daughter.' I says, 'Is it?' and they say 'Yes'—I says * * * 'You done that way down here?' I says, 'You are beating me now.' He says, 'Yes, I am just that much the best man,' and I asked her, and she says, 'Yes, that is my daughter.' By the Court: You say

you told him he was beating you? A. Yes, sir; and he said he was just that much the best man, and we just laughed it off. Q. What else did they tell you? A. I don't remember now. Q. Who did he say his wife was? A. I says, 'What you do with your Lucy?' He says, 'Oh, me and her, we parted.' I says, 'You just resting up. When you get rested up, you will go back again.' And he says, 'I will go back if she will let me.' He went off and came back, and I says, 'Have you been up there?' and he says, 'Yes, I have been there, but she run me off.' He says, 'This time I go I think I will stay,' and the next time he went back he was gone and he never come back any more."

Another witness testified that Ella Allen, by common repute, was looked upon at the time as a "stray child."

In view of the foregoing, and especially that part thereof concerning the birth of a child to each woman in the same year, we cannot escape the conclusion that this sojourn with Melinda, even though it was possibly a prolonged one, was merely the amour of a philandering husband.

We know of no valid form of marriage, under any theory, wherein the mutual consent of both parties to the present assumption of the marital relation, and all that it implies, is ever dispensed with. In marriage by formal ceremony this consent is expressly announced; in common-law marriage it is implied from evidence from which the inference is reasonable that the minds of the parties did in fact meet in the necessary agreement; in marriage by tribal custom the consent may be either expressed or implied, but nevertheless there must be some fact or circumstance inferring such necessary consent.

In some few cases mere cohabitation, prolonged and under circumstances corresponding to those of actual marriage, has been held sufficient from which to imply that the marriage agreement was made. There have been many instances in which one of the parties, by cohabiting with and holding out the other party to the public as his or her spouse, has been estopped to deny that the agreement was at some time made. There are many elements of evidence which may be used to establish such marriages, but in the final analysis they all center toward the hub of the inquiry, namely the aforesaid agreement, consent, or meeting of the minds. There is little of such evidence in this case. We are asked here to believe that in a union wherein lawful children were born over a period of 30 years, both before and after and also during the extra-marital

affair, the husband in shuttling back and forth between the two women thereby intended, by tribal custom or otherwise, to divorce his lawful wife and take unto himself the other in her stead, as his true and lawful wife. We are next asked to hold that upon the cessation of his philanderings he per se intended to divorce number two and rewed number one. This is entirely too fanciful. We think that the facts speak for themselves so significantly that prolonged discussion is unnecessary. If we rule out recognition of polygamy, there must first be some evidence, even under liberal tribal customs (of which there was some mention), of an intention to permanently abandon Lucy. Jesse Brown did leave Lucy and temporarily live with the other woman, but it was only transitory, and interspersed with visits back to and with his lawful wife, followed by a permanent resumption of his marital relationship with the said lawful wife, resulting in the birth of three more children and lasting through the remainder of their lives.

The defendant proposes the familiar principle that the presumption in favor of matrimony is one of the strongest known to the law, that the law presumes legitimacy and not illegitimacy and is astute to preserve the sanctity of the marriage relation. It appears to us that this presumption in the present case is more harmful than beneficial to the defendant, for to indulge it in her favor would necessitate doing it violence in connection with Lucy, the lawful wife of Jesse, and especially to Louisa, who was born by Lucy at the same time as defendant was born to Melinda.

The defendant cites Coachman v. Sims, 36 Okla. 536, 129 P. 845, wherein it was held that upon the showing that deceased and a woman had lived together 23 years, and at the time of their marriage a former wife was still living, it would be presumed that a lawful separation and divorce had occurred between the deceased and the former wife, in the absence of further evidence on the subject. We have no such "absence of further evidence on the subject" in the instant case, for here the conduct of the parties, for many years before and after the Melinda escapade, clearly negatives the idea of a presumptive separation and divorce between Jesse and Lucy.

It is also contended that Ella Allen, the defendant, was legitimatized by force of the Congressional Act of May 2, 1890 (26 Stat. 98), legitimatizing the issue of marriage contracted in accord with the laws and customs of any Indian nation located in the Indian Territory. The relationship that that act purported to and did validate, for the purpose of legitimatizing issue, was a marriage in some form, not a mere meretricious cohabitation. That act did not legitimatize the issue of so-called marriages assumed in violation of the statutory law and not authorized by established custom. Owens v. Carpenter, 123 Okla. 133, 252 P. 61; Henson v. Johnson, 117 Okla. 87, 246 P. 868. Sufficient evidence of marriage by custom is not set forth in this record. Certainly the purported marriage between Jesse and Melinda was not in accord with the laws of the Chickasaw Nation, for in 1867, prior to the birth of the defendant, the Chickasaw Nation adopted a Constitution, wherein section 15 of the Bill of Rights provided that "Neither polygamy nor concubinage shall be tolerated in this Nation, from and after the adoption of this Constitution." (Constitution, Treaties and Laws of the Chickasaw Nation, by Davis A. Homer.) It was held in Owens v. Carpenter, and Henson v. Johnson, both supra, from which latter decision we quote, that:

"It would be both libelous and slanderous for this court to hold that there was any custom authorizing such polygamous relations in face of the clear language of the statute law. * * *"

The parties agree that under appropriate statute law (the same as our present section 1619, O. S. 1931), if defendant was an illegitimate child, she was not an heir at law. The finding that she was illegitimate is sustained by an overwhelming preponderance of the evidence.

Plaintiffs in error urge two other propositions, relating to the rules of pleading, which in our judgment are without merit and need not be discussed.

The judgment is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and WELCH and CORN, JJ., concur.